Goetz Fitzpatrick LLP                                **Return Date: January 22, 2014**
One Penn Plaza                                            **@ 9:45 a.m.**
New York, New York 10119
Telephone: 212-695-8100
Facsimile: 212-629-4013
By:  Gary M. Kushner, Esq.
Scott D. Simon, Esq.

*Attorneys for 308 West 78th Corp.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X        Chapter 11
In re:
                                                                             Case No. 13-10205 (REG)

GPS GLOBAL PARKING SOLUTIONS LLC,

                    Debtor.

---------------------------------------------------------X

**OBJECTION OF 308 WEST 78TH CORP. TO APPROVAL OF DEBTOR'S
DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. §1125(a) AND
FEDERAL RULE OF BANKRUPTCY PROCEDURE 3017**

**TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:**

        308 West 78th Corp. ("308"), objecting to the disclosure statement (the "Disclosure

Statement") filed by the above-captioned debtor and debtor-in-possession (the "Debtor"),

respectfully represents as follows:

                            SUMMARY OF OBJECTION

        1.        308 submits that the Debtor's motion to approve the Disclosure Statement should

be denied for the following material reasons:

                a.        the Disclosure Statement lacks adequate information, particularly (i) a
                          valuation of the Debtor's assets; (ii) financial projections; and (iii) a
                          liquidation analysis; and

                b.        the Disclosure Statement describes a plan of reorganization that is patently
                          unconfirmable in that, *inter alia*, it fails to meet the fair and equitable
                          standards under §1129(b)(2)(A)(i)of the Bankruptcy Code with regard to
                          308's secured claim.

<u>BACKGROUND FACTS</u>

**A.    <u>308's SECURED CLAIM</u>**

2.      308 holds a first priority mortgage lien (the "Mortgage") on the Debtor's property, commonly known as the Condominium Garage Unit (the "Mortgaged Unit" or "Garage") at 151 West 17th Street, New York, New York (the "Building").

3.      The Mortgaged Unit is the Debtor's only asset. As detailed below, during the course of this proceeding, the Debtor entered into a management agreement with Central Parking (as defined below), whereby Central Parking will operate the Garage and provide monthly payments to the Debtor. These payments constitute the Debtor's sole source of income.

4.      The promissory note held by 308 (the "Note"), which is secured by the Mortgage, matured by its terms on October 1, 2013, at which time the entire loan to the Debtor became due (the "Maturity Date").  As set forth below, 308's pre-petition claim against the Debtor is in excess of $2,200,000.

5.      The Note provides for a non-default fixed interest rate of eight percent (8%) per annum.

6.      Default interest on the Note runs at the rate of twenty-four percent (24%) per annum or the maximum rate of interest allowable by law, whichever is lower. Interest of 24% on a loan of this nature is allowable by law and, thus, constitutes the applicable default rate under the Note.

7.      The Note further provides for the Debtor's payment of an exit fee in the amount of $37,500 (the "Exit Fee"), which became due and payable on the Maturity Date.

8.      In connection with the Mortgage, the Debtor pledged, and 308 holds, an assignment of leases, rents and profits attributable to the Mortgaged Unit, which serves as additional collateral for the repayment of the Note (the "Assignment of Rents").

2

9.      In addition to the Assignment of Rents, the Mortgage further provides 308 with other forms of collateral as security for the repayment of the Note, including condemnation rights and liens upon the Debtor's personalty, covering such items as the proceeds of insurance recoveries, deposits and cash, among others (the "Additional Collateral").

10.     The Debtor filed its chapter 11 petition on the eve of its deadline to file opposition to 308's motion for summary judgment in a foreclosure action involving the Mortgaged Unit which is pending (and now stayed) in the Supreme Court for the State of New York, County of New York bearing Index No. 850070/2012 (the "Foreclosure Action").

11.     Prior to the commencement of the Foreclosure Action, the Debtor entered into a settlement and forbearance agreement effective as of April 1, 2012 (the "Settlement Agreement") which, *inter alia*, required the Debtor to make monthly payments of $15,387.15 for each of the months of April, May, June and July, 2012.

12.     The Settlement Agreement resolved the Debtor's prior default under the Note and Mortgage. The Debtor's putative equity holders, Mr. Danalis and Mr. Lapsatis, provided personal guarantees of the Note, Mortgage and the obligations under the Settlement Agreement.

13.     Although given a second chance, the Debtor immediately defaulted on its obligations under the Settlement Agreement. Indeed, neither the Debtor nor the Debtor's equity holders ever made a single payment due under the Settlement Agreement.

## B.      **BANKRUPTCY EVENTS**

14.     The Debtor filed its voluntary petition on January 24, 2013 (the "Petition Date").

15.     Upon information and belief, from and after the Petition Date until recently, the Debtor generated income ranging in amount between $7,000-$9,000 per month solely from month-to-month leases with tenants of the Building. As of the Petition Date, and throughout most of the chapter 11 case, the Debtor had no ability to handle "transient" parking.

16.     On May 13, 2013, this Court entered an order authorizing the Debtor to enter into

3

a construction contract which would enable the Garage to accommodate "transient" parking.

17.     Upon information and belief, the construction project at the Garage was completed in late 2013. According to pleadings filed in this Court by the Debtor (but otherwise not discussed in the Disclosure Statement), the Garage is now fully legalized to provide transient parking to the general public. The Debtor has stated to the Court on multiple occasions that the addition of transient parking will significantly increase the Debtor's revenues and adds significant value to the Garage.

18.     The Court recently approved the Debtor's contract with Central Parking Systems ("Central Parking") to manage the Garage – although there is no indication in the Disclosure Statement whether Central Parking has commenced its management duties or whether the transient parking aspect of the Debtor's operations has started.

19.     At no time during the chapter 11 case has the Debtor sought formal approval for use of 308's cash collateral, although 308 has voluntarily consented to the limited use of cash collateral to enable the Debtor to pay necessary operating costs for the maintenance and preservation of the Garage, including the payment of insurances and utilities.[1]

20.     On May 13, 2013, this Court also signed and entered an order authorizing the Debtor to borrow funds from Mr. Lapsatis and Mr. Danalis pursuant to §503(b) and 364(b) of the Bankruptcy Code (the "DIP Order") [ECF No. 36].

21.     Since May 2013, in accordance with the DIP Order, 308 has received monthly adequate protection payments pursuant to §362(d)(3) of the Bankruptcy Code in the amount of $14,574.42 (the "Adequate Protection Payments").

22.     On May 23, 2013, 308 timely filed a proof of claim against the Debtor's estate, which was designated by the Clerk of the Court as claim #2 (the "308 Proof of Claim").

---

[1] Indeed, the Debtor has flatly refused to enter into a cash collateral agreement with 308.

23.     The 308 Proof of Claim asserts a secured claim in the amount of $2,234,553.74 and includes principal, interest (both contract and default) and attorneys' fees, all as of the Petition Date (as defined below), as permitted under the Note.

24.     The 308 Proof of Claim does **not** include the Exit Fee, post-petition interest or post-petition costs and fees, including 308's reasonable attorneys' fees.

25.     The Debtor has not filed an objection to the 308 Proof of Claim.

26.     Upon information and belief, each of the Adequate Protection Payments have been funded, in whole or in part, through contributions from the Debtor's equity holders.

27.     The Adequate Protection Payments are interest-only in nature and based upon the non-default contract interest rate of 8% under the Note, multiplied against the amount asserted in the 308 Proof of Claim ($2,234,553.74).

28.     As set forth in the DIP Order, the Adequate Protection Payments are being made to, and accepted by 308, without prejudice to the rights of the Debtor to challenge the allowed amount of the 308 Proof of Claim, nor to 308's right to seek the default interest rate of 24% per annum under the Note.[2]

## C.     THE PLAN

29.     On December 20, 2013, the Debtor filed the Disclosure Statement which, *inter alia,* describes the terms and conditions of a plan of reorganization (the "Plan"). The Plan provides for payment to five (5) classes of claims and interests.

30.     **Class 1**  of the Plan consists of unpaid pre-petition real estate tax liens held by the City of New York and will be paid, in full, with twenty (20) quarterly payments (with statutory interest). The Class 1 claimant will retain its pre-petition lien on the Garage. Class 1 is unimpaired and not eligible to vote on the Plan.

---

[2] The illustration in the Disclosure Statement only describes 308's claim as of the Petition Date and does not otherwise include, *inter alia*, post-petition default interest. Consequently, the Disclosure Statement significantly understates the actual amount of 308's secured claim.

31.    **Class 2** of the Plan consists of the Mortgage held by 308. The Debtor seeks to restructure the Mortgage from a fully-matured loan into a ten (10)-year loan, payable at an interest rate of 4.25% based upon a 25 year amortization schedule. Monthly payments to 308 under the Plan would be $12,105.43, with a balloon payment of $1,601,247.50 at the end of the 10-year period.

32.    308 will retain its first mortgage lien on the Garage.

33.    The Plan does not mention whether 308 will maintain its rights in and to the Assignment of Rents or the Additional Collateral. Neither the Plan nor the Disclosure Statement appear to provide 308 with this collateral, although the Disclosure Statement does indicate that 308 will retain the personal guarantees of Mr. Danalis and Mr. Lapsatis.[3]

34.    Class 2 is impaired and entitled to vote.[4]

35.    **Class 3** of the Plan consists of the secured claim of the Condo Board Association at the Building (the "Condo Board"). The Condo Board will be paid, in full, with an initial paydown of $20,381.84 on the Effective Date. The balance of the Condo Board's claim is paid in 30 monthly installments, with interest at 4%.

36.    The Plan provides that the Condo Board will retain its judgment lien against the Property.

37.    Class 3 of the Plan is impaired and entitled to vote.

38.    **Class 4** of the Plan consists of allowed unsecured claims. Claimants in this class will receive 100% payment on their claims – 50% on the Effective Date and 50% six (6) months after.

---

[3] Notwithstanding the Debtor's pledge of its principals' guarantees, the Disclosure Statement prohibits 308 from reviewing the equity holders' financial statements, which will only be provided to the Court for an *in camera* inspection. 308 will object to any plan which does not permit it to independently evaluate the financial condition of any guarantor.

[4] 308 has indicated to the Debtor that, based upon, *inter alia*, the legal infirmities set forth herein, 308 will vote to reject the Plan under its present iteration, and will object to confirmation.

39.     Although Class 4 is being paid, in full, the Disclosure Statement nevertheless states that this class is impaired and entitled to vote on the Plan.

40.     **Class 5**  of the Plan consists of the equity interests in the Debtor. Holders of equity interests in the Debtor will retain their equity interests in the reorganized Debtor.[5]

41.     In addition to the five (5) classes of claims and interests, the Plan further provides for payment of all administrative expense claims, including professional fees (expenses of Debtor's counsel), post-petition real estate taxes due to the City of New York and ordinary course expenses incurred in the operation of the Debtor's business since the Petition Date.

42.     Under the Plan, ordinary course debts will be paid in accordance with trade terms. Professional fees (as allowed) and real estate taxes will be paid, in full, upon the Effective Date of the Plan.

43.     The Disclosure Statement indicates that funding of the Plan, including all funds due on the Effective Date, shall be made from receipts generated from Garage operations and/or from "new value" contributions made, or to be made, by Mr. Danalis and Mr. Lapsatis. The principals will also "backstop" the Debtor's operations with additional funds on an as-needed basis.[6]

---

[5] The Disclosure Statement promotes the Debtor's belief that the retention of the Debtor's equity interests in the reorganized Debtor will satisfy the "new value" exception to the absolute priority rule, but omits any discussion, legal analysis or facts as to why. Although the issue of whether the Plan satisfies the absolute priority rule may be best addressed at a confirmation hearing, 308 would be remiss if it did not point out that the loans to the Debtor from Mr. Danalis and Mr. Lapsatis pursuant to the DIP Order may not, and likely do not, qualify as "new value."

[6] 308 has objected, and will continue to object to the Debtor's use of 308's cash collateral except to the extent necessary to enable the Debtor to pay, through the confirmation hearing, any necessary expenses which preserve and maintain the Garage, such as real estate taxes, utilities and insurance. 308 specifically objects to the Debtor's use of cash collateral to pay any of the Debtor's other operating expenses or to fund any of the Debtor's obligations which may fall due on the Effective Date of the Plan, except as they may be due and payable to Class 2.

<u>LEGAL ARGUMENT</u>

**A.      The Disclosure Statement Lacks Adequate Information**

The standard by which a bankruptcy court determines the adequacy of a disclosure statement is set forth in §1125(a) of the Bankruptcy Code. Section 1125 requires that the Disclosure Statement contain adequate information such that a hypothetical reasonable investor typical of holders of claims or interests of relevant classes can make an informed judgment about the Plan and the treatment proposed for its claims. *See* 11 U.S.C. § 1125(a)(1)3; *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [a creditor's] claims and the possible [Bankruptcy Code] alternatives . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr.N.D.N.Y. 1988).

Despite the clear requirement imposed by the Bankruptcy Code, the Disclosure Statement fails in several material respects to provide adequate information on critical matters. Without additional disclosure on the matters set forth herein, the Disclosure Statement does not provide creditors with the information needed to make "an informed judgment about the Plan," does not meet the requirements of section 1125 of the Bankruptcy Code, and should not be approved.

**(i)      Failure to Provide an Asset Valuation**

The failure of the Disclosure Statement to contain an appraisal or valuation of the Debtor's assets prevents a hypothetical investor from making an informed decision about whether to vote to accept or reject the Plan because the hypothetical investor will not have a basis to determine whether the market value of the Garage is (i) sufficient to support the implementation of the Plan and the contemplated distributions to creditors, or (ii) great enough to require better treatment of claims under an alternate plan or in a liquidation.

The Disclosure Statement does not even hint at the value of the Garage notwithstanding the Debtor's repeated proclamations during the chapter 11 case that 308 is fully secured by the value of the Garage (its value having purportedly skyrocketed by virtue of a five-fold increase in revenues to be realized from the implementation of transient parking). The net effect of omitting a valuation of the Garage, as the Debtor has chosen to do for purposes of its Disclosure Statement, is to deprive creditors the opportunity of ascertaining whether the proposed payments under the Plan are more than what they would get upon liquidation – even where, as here, the Plan provides for 100% payment to all classes of claims. If, indeed, the Garage's value has increased to provide a significant equity cushion due to the recent construction, creditors may also be entitled to interest on their claims. Consequently, the Disclosure Statement must provide a valuation of the Garage so creditors can make an informed decision about what they are entitled to receive under the Plan.

The Disclosure Statement's omission of a value for the Garage is particularly significant to 308, because it will be seeking recovery of the Exit Fee, default interest and reasonable attorneys' fees which have come due since the Petition Date. Simply put, if there is equity in the Garage, 308 will be entitled to collect default interest – which, in turn, will render incorrect the Debtor's discussion of the allowed amount of 308's secured claim as it is presently presented in the Disclosure Statement.[7] *See generally In re 785 Partners, LLC*, 470 B.R. 126 (Bankr.S.D.N.Y. 2012). There is no discussion whatsoever in the Disclosure Statement as to what might happen if the Debtor is required to pay 308 default interest, the Exit Fee or attorneys' fees.

A valuation of the Garage is also significant because the Debtor intends to satisfy its obligation to 308 with a future "balloon payment." Presently, the Disclosure Statement provides

---

[7] The Disclosure Statement assumes that 308's allowed claim is no more than $2,234,553.74 – utterly disregarding the inclusion of amounts that became due under the Mortgage after the Petition Date.

9

no explanation as to how this will be accomplished. Ultimately, the source of the balloon

payment goes to the issue of the Plan's feasibility. However, to the extent that the Debtor's

performance of the obligations described in the Plan is predicated on a sale, refinance or other

future liquidating event, the Disclosure Statement should at least predict what that event will be,

what steps the Debtor's management will take to bring it about, and how likely it is to occur. The

Disclosure Statement provides no guidance on these issues – and the absence of any appraisal or

credible valuation makes it impossible for any creditor, much less 308, to evaluate whether the

Plan can be successfully consummated.

Section 1129(a)(7) of the Bankruptcy Code provides that, in order to be confirmable, a

plan must provide that "each holder of a claim or interest of such class (i) has accepted the plan;

or (ii) will receive or retain under the plan on account of such claim or interest property of a

value, as of the effective date of the plan, that is not less than the amount that such holder would

so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11

U.S.C. §1129(a)(7). The Disclosure Statement is devoid of any discussion concerning the rights

of creditors under the Bankruptcy Code where it is determined that equity exists in the Debtor's

property sufficient to pay creditors in full.

The "best interests test" requires the Debtor to demonstrate that each class of creditors is

better off under the Plan than in a liquidation of the Debtor. In this case, 308 submits that it is

impossible for creditors to make that determination without the Debtor's inclusion of an

appraisal or other credible valuation of the Garage. Until such information is provided, creditors

cannot evaluate the Debtor's ability to successfully reorganize and the requirements of section

1129(a)(7) of the Bankruptcy Code cannot be met.

**(ii)**    **Insufficient Financial Projections**

The only trace of a "financial projection" in the Disclosure Statement is contained in

Exhibit "A", which purports to be an estimated operating budget for a one (1) year period –

nothing more.[8] That estimated operating budget does not come close to sufficient disclosure of the reorganized Debtor's projected cash flow, income and/or expenses over the term of the Plan, which spans well into the future.

The lack of any cash flow projection and/or other financial information does not allow a hypothetical investor to assess the Debtor's ability to achieve the cash outlays required under the Plan. This omission is particularly important where, as here, the Disclosure Statement implies that there may be future cash flow shortages which call for the Debtor's principals to be a "backstop." (*See* Disclosure Statement, p. 15.)

Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine whether a plan is feasible. At the disclosure stage, the Court and creditors should be able to dissect the Debtor's financial projections to assess whether the Plan meets the feasibility requirements of the Bankruptcy Code. 308 submits that even the most rudimentary analysis of the Debtor's projections is impossible, rendering an assessment of the Plan's feasibility a nullity.

(iii)    **Failure to Provide a Liquidation Analysis**

A liquidation analysis is a necessary precondition to confirmation of the Plan, required by section 1129(a)(7) of the Bankruptcy Code. The "best interests of the creditors" test embodied by section 1129(a)(7)(A) requires that under a plan, a creditor or interest holder must receive property equal to the participant's hypothetical distribution if the debtor were liquidated instead of reorganized.

Be it by design or neglect, the Debtor completely omits from the Disclosure Statement a

---

[8] Indeed, this scant "projection" was the same document annexed to the Debtor's recent application to approve its management agreement with Central Parking. Neither the Disclosure Statement nor the Debtor's prior motion explains, in any meaningful detail, the assumptions and/or data upon which this budget was based. Suffice to say, the apparent need for "backstop" contributions by the Debtor's principals amplifies the need for detailed cash flow projections. Moreover, the commitment of the Debtor's principals is rendered meaningless unless creditors can determine, through their own analysis, the financial wherewithal of these individuals. The submission of this information solely for the Court's review does not provide 308 with the right to make its own informed determination about the merits of the Plan. Moreover, the Plan makes an illusory promise to creditors in that it does not affirmatively bind the Debtor's principals to do anything if the Debtor cannot meet its obligations.

11

liquidation analysis which invariably would contain, among other things, the value of the Garage. Without the value of the Debtor's assets, a creditor cannot evaluate whether its distribution under the Plan (even though 100% is being paid) is greater than what it may be entitled to receive if the Garage were sold at liquidation (for example, where there may be sufficient proceeds to pay creditors in a shorter time frame, with interest).

**B.** **The Disclosure Statement Should Not be Approved Where the Plan is Patently Unconfirmable**

Even had the Disclosure Statement provided adequate information, which it clearly does not, a disclosure statement that describes a plan of reorganization that is unconfirmable on its face should not be approved, as solicitation of the vote would be futile. *See In re Quigley Co*., 377 B.R. 110, 115 (Bankr.S.D.N.Y. 2007); *In re Filex, Inc*., 116 B.R. 37, 41 (Bankr.S.D.N.Y. 1990); *In re Beyond.com*, 289 B.R. 138, 140 (N.D. Cal. 2003) (collecting cases); *In re Phoenix Petroleum Co*., 278 B.R. 385, 394 (Bankr. D. Pa. 2001); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr.E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y.1992). Objections to the confirmability of a plan may be raised at the hearing on the adequacy of the Disclosure Statement. *See In re Quigley Co*., 377 B.R. at 115. The Debtor's Disclosure Statement should not be approved because the Plan describes a plan that is neither fair nor equitable to 308, and, thus, is patently unconfirmable as a matter of law.

308 will vote to reject the Plan as presently constituted because the Plan is not fair or equitable to 308. The Class 2 rejection will trigger the provisions of §1129(b)(2)(A) of the Bankruptcy Code with respect to confirmation of the Plan.[9]

Bankruptcy Code Section 1129(b)(2)(A)(i) sets forth the requirements to treat a dissenting impaired class fairly and equitably. *In re Cellular Info. Sys.,* 171 B.R. 926, 937

_____

[9] 308 fully recognizes that the Debtor has three (3) options under § 1129(b)(2)(A) of the Bankruptcy Code to demonstrate the fairness and equality of the Plan as to the secured claim in Class 2. Notwithstanding, the Disclosure Statement seemingly does not implicate 308's need to address the provisions of either §§1129(b)(2)(A)(ii) or 1129(b)(2)(A)(iii) of the Bankruptcy Code, which 308 respectfully believes do not apply to the type of cramdown being attempted by the Debtor in the Plan.

(Bankr.S.D.N.Y.1994) (noting that "[a]t minimum, a fully secured creditor is treated fairly and equitably if it retains the liens securing its claim and receives deferred cash payments which have a present value equal to the amount of its claim").

Here, the Disclosure Statement describes a Plan which fails to (a) provide 308 with retention of liens on all of its pre-petition collateral, and (b) pay 308 deferred cash payments with a present value equal to the allowed amount of its claim, inclusive of an appropriate amount of interest as compensation for the payments to be deferred over time.[10]

### (i)     The Plan Does Not Provide 308 with Replacement Liens on All Pre-Petition Collateral

The first element of the fair and equitable standard under §1129(b)(2)(A)(i) requires that 308 retain pre-petition liens securing its claim. While the Plan provides that 308 will retain its mortgage lien on the Garage, the Disclosure Statement describes a Plan which does not provide 308 with the Assignment of Rents or with the Additional Collateral, both important aspects of the collateral package that existed as of the Petition Date.

Consequently, the Plan fails to meet the requirements of §1129(b)(2)(A)(i)(I) and cannot be confirmed over the objection of 308. *See generally In re 20 Bayard Views LLC*, 445 B.R. 83, 105 (Bankr. E.D.N.Y. 2011). *See* also *In re Hoffman*, 52 B.R. 212, 217 (Bankr. D. N. Dakota, 1985) ("…the Plan does not provide fair and equitable treatment of the Government's claims where its provisions substantially vary the terms and conditions of the original agreements made with the Government").

### (ii)    The Interest Rate to be Paid to 308 is Unfair and Contrary to Applicable Law in This Jurisdiction

The second element of the fair and equitable standard requires that 308 receive deferred

---

[10] 308 believes that there are other aspects of the Plan which may be the subject of an objection to confirmation including the proposed amortization rate of the cramdown loan, the failure to include non-monetary covenants, the inclusion of a balloon payment and the absence of a default interest rate, among others. 308 reserves all of its rights to address those issues (and others) at the confirmation hearing.

cash payments equal to the present value of its allowed claim under the Plan. 11 U.S.C. § 1129(b)(2)(A)(i)(II). As the Supreme Court noted, "a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an <u>appropriate</u> amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." *Rake v. Wade*, 508 U.S. 464, 472 n. 8, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (emphasis added). *See also Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns)*, 547 F.3d 763, 768–69 (7th Cir.2008) (finding that a claim that is paid over time pursuant to Section 1129(b)(2)(A)(i)(II) requires the payment of appropriate interest).

Here, the Debtor relies solely upon the Supreme Court's decision in *Till v. SCS Credit Corp.*, 544 U.S. 465, 124 S. Ct. 1951 (2004) (hereinafter "*Till*") to promote a cramdown interest rate of 4.25% with respect to 308's secured claim. The Debtor's reliance on the *Till* decision is entirely misplaced and the proposed interest rate provided to 308 under the Plan is <u>inappropriate</u>, unfair and inequitable.

First, the import of the *Till* decision is not readily applied by Courts in this jurisdiction where, as here, the cramdown plan pertains to a chapter 11 case. *See generally In re DBSD North America, Inc.*, 419 B.R. 179, 208 (Bankr. S.D.N.Y. 2009) (hereinafter "*DBSD*"). Second, even if the reasoning of the *Till* decision applied here, the interest rate proposed by the Debtor is still woefully inequitable and unfair to 308.

*Till* – decided in the context of a Chapter 13 case – involved a loan secured with a truck valued at $4,000. The Debtors' chapter 13 plan proposed to repay the loan over three years at a significantly reduced rate from the original contract. The question in *Till* was the appropriate rate of interest to be applied to the loan.

The plurality opinion of the Supreme Court outlined four (4) possible approaches to calculating cramdown interest rates: (i) the coerced loan approach; (ii) the cost of funds approach; (iii) the presumptive contract rate approach; and (iv) a formula rate approach to be

based on an upward risk adjustment to the national prime rate (the "Prime Rate").

In the formula approach approved by the Court, the risk adjustment would depend on the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan. The *Till* Court sent the case back to the bankruptcy court to conduct a hearing to select a rate high enough to compensate the creditor for its risk, but not so high as to doom the plan. It then noted, in *dicta*, that other courts have generally approved adjustments of 1-3% above the Prime Rate. The *Till* Court concluded that the formula rate approach was appropriate because the other formulas were complicated, imposed significant evidentiary costs and aimed to make each creditor whole rather than to provide the required present value of debtors' deferred payments.

However, and most significant here, the Supreme Court in *Till* did not directly address the question of whether the formula approach should apply outside of the Chapter 13 context, although a reading of the Disclosure Statement would falsely suggest that it does.

The Supreme Court stated that it is "likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any ... [cramdown] provision[ ]." *Till*, 541 U.S. at 474, 124 S.Ct. 1951. At the same time, the Supreme Court contrasted Chapter 13, where there may be no discernible market interest rate for cramdown loans, and Chapter 11, where there may be lenders that will provide financing. The Supreme Court observed that "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id.*

This Court has already refused to blindly adopt the rationale used in *Till* and has opted **not** to apply the "formula" approach in the context of a chapter 11 case. In *DBSD*, this Court specifically observed that a market interest rate should be used as a benchmark when a market exists for a loan to a Chapter 11 debtor:

> In determining the appropriateness of a proposed
> cramdown interest rate, courts in this district have
> looked to the market interest rate for loans with
> similar terms. Still other courts have considered the
> prepetition contract rate in determining whether the
> cramdown interest rate is sufficient. There is other
> arguably relevant law, under chapter 13 of the
> Bankruptcy Code, but I consider reliance on these
> two bases to be preferable.

*In re DBSD N. Am.*, 419 B.R. at 209, aff'd sub nom. *Sprint Nextel Corp. v. DBSD N. Am. Inc.*, 2010 WL 1223109 (S.D.N.Y. Mar.24, 2010), *aff'd in part, rev'd* in part sub nom. *Dish Network Corp. v. DBSD N. Am. Inc.*, 2011 WL 350480 (2d Cir. Feb.7, 2011). *See also Bank of Montreal v. Official Comm. Of Unsecured Creditors (In re Home Patient)*, 420 F.3d 559 (6th Cir. 2005) (hereafter "*Home Patient*") ("*Till's* formula approach did not apply in a chapter 11 case where an efficient market existed.") *Id*. at 568. *See also In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 255 (Bankr. M.D. Fla. 20006) (the appropriate cramdown rate in a chapter 11 is determined by the "prevailing market rate for a loan of a term equal to the payout period, taking into account the quality of the security and the risk of default.").

These decisions uniformly stand for the proposition that under §1129(b)(2)(A)(i) of the Bankruptcy Code, the cramdown interest rate for a secured claim in a chapter 11 case should be determined by first examining whether an "efficient market" exists and then using the efficient market to determine the "market rate" of interest to be paid on the secured claim.

308 submits that an efficient market for obtaining a commercial first mortgage on an income-producing property such as the Garage most assuredly exists, a conclusion perhaps best underscored by the fact that the Debtor was able to obtain mortgage financing seven years ago when it bought the Garage – at a time when the revenues capable of being generated from the

Garage did not exceed $10,000.00 per month.[11] Even without speculating whether there may

exist the possibility of securing a new loan in an efficient market, this Court should, and it has in

the past, looked to the contract rate (here 8%) to garner a more <u>appropriate</u> rate of interest than

that which has been provided by the Debtor in the Disclosure Statement.[12]

       Be that as it may, whether there is an efficient market, and if so, what interest rate would

exist therein are, admittedly, questions for another day. The point now, however, is that the

Disclosure Statement only speaks to the application of the *Till* case as the barometer for

establishing an appropriate cramdown rate to apply to 308's Mortgage. The *Till* decision is not

the correct legal standard to be applied to a chapter 11 case pending in this Court. In that regard,

the discussion in the Disclosure Statement about *Till* must be corrected. The Disclosure

Statement should be amended to include a discussion of the appropriate and proper legal

standard by which the Court would determine the rate of cramdown interest. The Debtor's

omission of the correct legal standard applicable to a cramdown plan in favor of the discussion in

*Till* (which doesn't apply and is not the law) should give ample cause for this Court to deny

approval of the Disclosure Statement at this time.

       Moreover, even if the *Till* decision becomes relevant here, the Disclosure Statement

entirely mischaracterizes the import of that decision to give creditors the false belief that the

appropriate risk factor rate is between 1 and 3 percent above the Prime Rate. The appropriate risk

adjustment is determined by considering factors including "the circumstances of the estate, the

nature of the security, and the duration and feasibility of the reorganization plan." *Till,* 541 U.S.

at 479, 124 S.Ct. 1951. Additional "risk factors to consider include the debt service coverage

---

[11] In addition, the Debtor was able to reinstate and recast the terms of its loan with the then-current lender after it
defaulted – another indication that an "efficient market" exists.  If no such market existed, then the prior lender
likely would not have reinstated a loan which was in default.
[12] It is worthy of mention that the Debtor did not disclose whether it has attempted to secure a replacement loan and
if so, the results of that effort. Ironically, the *Till* rationale may become relevant here if, but only if, the Debtor can
demonstrate that there is no efficient market for a new loan – information which has yet to come forward by way of
the Debtor's disclosure.

ratio, the loan-to-value ratio, and the quality of any guarantors." *In re Griswold Bldg. LLC,* 420 B.R. 666, 693 (Bankr.E.D.Mich.2009). *See In re Gramercy Twins Assocs.,* 187 B.R. 112, 124 (Bankr.S.D.N.Y.1995) (noting that "the relatively high loan to value ratio in this case, which is approximately 85%, increases the risk factor"); *Deep River Warehouse,* 2005 WL 2319201, (observing that "[r]isk is increased significantly when the loan to value ratio is 100%, but a high grade tenant positively affects that risk"). No mention of these factors, much less the legal framework in which they are analyzed, is included in the Disclosure Statement.

Nor is the Debtor accurate when it affirmatively states in the Disclosure Statement that a 1-3% risk adjustment is a ceiling. In *Till,* the Supreme Court noted that courts <u>generally</u> grant a one to three percent risk adjustment when applying the formula approach. *Till,* 541 U.S. at 480, 124 S.Ct. 1951. Courts have also applied significantly higher risk adjustments to reflect the particular circumstances of a case. *See, e.g., In re Griswold Bldg. LLC,* 420 B.R. at 696 (applying a five percent risk adjustment); *In re Nw. Timberline Enters.,* 348 B.R. at 434 (determining there was "no 'efficient market' of lenders willing to provide an exit loan identical to what is being offered to [the secured lender] here," and concluding that a 5.75 percent risk adjustment was appropriate).[13]

Neither 308 nor the Court presently have enough information from the Debtor to assess whether the *Till* decision should apply, or, if it does, whether the appropriate risk factor is 1-3% or something more. As previously noted, the Debtor needs to supplement the Disclosure Statement with adequate information including the value of the Garage and a comprehensive

---

[13] Justice Scalia, in his dissenting opinion in *Till*, emphasized that the goal of determining an appropriate risk factor in a cramdown plan is to ensure that a secured creditor be fully compensated for the risk that plan failure will occur. *Till* at 491. Notably, Justice Scalia suggested, in the same way as this Court did in *DBSD*, that adoption of the contract rate would be the best indication of actual risk when evaluating the appropriate rate of interest in a cramdown plan. *Id.* at 492. Justice Scalia's opinion reinforces the concept that adequate compensation of a secured creditor may require a high interest rate and that, if the rate is too high for the plan to succeed, "the appropriate course is not to reduce it to a more palatable level, but refuse to confirm the plan." *Id.* at 491. Here, it is obvious that the Debtor is promoting an astoundingly low interest rate to further the chance of success on the Plan, even though by doing so it flouts applicable law.

cash flow analysis, among other facts and information. Whether the Court is guided by the market rate, the contract rate or mechanically follows *Till*, the interest rate proposed by the Debtor does not give 308 the present value of its claim.

Accordingly, the present version of the Plan is not fair and equitable with respect to 308 within the meaning of §1129(a)(2)(A)(i) of the Bankruptcy Code, and cannot be confirmed. As such, the Disclosure Statement is inadequate.

### (iii)    The Ten Year Mortgage Term is Not Fair or Equitable

Under the Plan, the Debtor proposes to transform an already-matured mortgage obligation into a 10-year loan with an amortization rate of 25 years. While 308 recognizes that involuntary extensions of loan obligations under a cramdown plan have been found to be fair and equitable, those cases uniformly have held so only where the secured creditor has been given the "indubitable equivalent" of its secured claim. *See In re Patrcian St. Joseph Partners Limited Partnership*, 169 B.R.669, 681 (Bankr. D. Ariz. 1994).[14]

A plan provides the indubitable equivalent of a claim where it "(1) provides the creditor with the present value of its claim, and (2) insures the safety of its principal [*sic*]." *DBSD, supra,* quoting *In re Sparks*, 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994).

Putting aside the inadequacy of the proposed cramdown interest rate, which in itself serves to nullify the indubitable equivalent requirement of §1129(b)(2)(A)(iii) of the Bankruptcy Code, 308's principal is not protected to the same extent it was as of the Petition Date. Among other things, the Plan strips 308 of valuable collateral rights including the Assignment of Rents and the Additional Collateral. And, without fundamental information presently lacking in the Disclosure Statement (such as an asset valuation or cash flow projection), there is no *bona fide* way to determine whether 308's claim is fully secured.

Moreover, 308 cannot presently determine what risk of default exists, a factor which is

---

[14] Here, the Debtor's Plan does not attempt to provide 308 with the indubitable equivalent of its secured claim.

critical here in light of the Debtor's implicit acknowledgement that payments under the Plan may have to be backstopped by Mr. Danalis and Mr. Lapsatis. The Plan strips 308 of the right to review the principals' financials. There is a profound need for 308 to do so for purposes of evaluating the Plan because Mr. Danalis and Mr. Lapatis similarly promised to fund the Settlement Payment but later defaulted. Had they backstopped the Debtor's obligations then, the Debtor would not have needed chapter 11 at all.[15]

### (iv)    Final Comments

Last, but no less important, by letter of its counsel dated January 9, 2014, 308 requested that the Debtor voluntarily, and without Court intervention, expunge inflammatory and misleading language from the Disclosure Statement, as it is inaccurate and entirely unnecessary in the context of the disclosure approval process.

The Debtor's response was curt and unhelpful. It further appears that the Debtor intends to maintain these disclosures, although they do provide no information, relevant or otherwise, for purposes of educating the Debtor's creditors about the terms of the Plan.

The Court should not need to micromanage the process of implementing changes to the Disclosure Statement, particularly where it concerns issues of this nature. Consequently, 308 respectfully asks this Court to direct the Debtor and its counsel to engage in a good faith discussion in which those points of concern raised by 308 are legitimately addressed and resolved.

---

[15] It is of little comfort to 308 that Mr. Danalis and Mr. Lapsatis have funded the Adequate Protection Payments. 308 firmly believes that they have done so only because the Bankruptcy Code expressly requires the tender of those payments and the failure to do so would likely have resulted in conversion of the case. 308 lacks any confidence that Mr. Lapsatis or Mr. Danalis will step up to the plate after the case is dismissed when this Court will no longer shepherd the Debtor's activities.

## **Conclusion**

For the foregoing reasons, the Disclosure Statement should not be approved.

Dated:  New York, New York
      January 16. 2013

                                        Respectfully submitted,

                                        GOETZ FITZPATRICK LLP

                                        By: /s/Gary M. Kushner____
                                              Gary M. Kushner, Esq.
                                        A Partner of the Firm
                                        Scott D. Simon, Esq.
                                        One Penn Plaza
                                        New York, New York
                                        (212) 695-8100