UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                          Chapter 11

GPS GLOBAL PARKING SOLUTIONS LLC,               Case No. 13-10205 (REG)

                        Debtor.
-----------------------------------------------------------x

### DEBTOR'S AMENDED
### DISCLOSURE STATEMENT PURSUANT TO
### SECTION 1125 OF THE BANKRUPTCY CODE

GPS Global Parking Solutions LLC (the "Debtor") hereby submits this Disclosure Statement (the "Disclosure Statement"), pursuant to §1125 of Title 11, United States Code (the "Bankruptcy Code"), in connection with the Debtor's accompanying Chapter 11 Plan of Reorganization of even date (the "Plan").

### I.   OVERVIEW

1.   **Introduction.** The Debtor owns a commercial condominium unit for a below ground parking garage at 151 West 17th Street, New York, New York (the "Garage"). The Garage is encumbered by three liens: a tax lien of the City of New York; a first mortgage held by 308 West 78th Corp. ("308") and a judgment lien held jointly by 151 West 17th Street Condominium (the "Condo Board").

The Debtor sought Chapter 11 protection based upon a very long period of time which was required to obtain approval of various subdivisions of the City of New York which would allow the Debtor reconfigure the access ramp to its garage so that it could double its monthly parking. The Debtor was also advised that by reconfiguring the access ramp, it would also be eligible to obtain a permit to allow for transient parking.

The Garage itself is approximately 10,200 square feet. It took six years for the Debtor to obtain the various consents needed from the City of New York and its subdivisions to obtain the necessary approvals. The process began at a time when the City actively discouraged increased pedestrian vehicular traffic in lower Manhattan, however, as will be described within this Disclosure Statement, the policy changed dramatically once the City implemented the Citi Bike Program in lower Manhattan.

During the six years that the Debtor was prosecuting its applications to reconfigure the Garage ramp, the Debtor's operations were funded in large measure by loans from its stockholders as its income was woefully insufficient to meet its obligations. Specifically, the acquisition of the Garage was financed by a loan from Country Bank in the original principal amount of $1,500,000. Approximately six months before the Chapter 11 case was filed, Country Bank sold its mortgage to 308 which declined to provide the Debtor with any form of accommodation and caused the Chapter 11 case to be filed. During the pendency of the Chapter 11 case, 308 has opposed nearly every application for relief filed before the Court. The Debtor, during the Chapter 11 case, has obtained authorization from the Court to enter into a construction contract to reconfigure the access ramp, to borrow monies from its putative stockholders to finance the construction project and recently when the construction project was completed, to enter into a Garage Management Agreement with Central Parking System of New York Inc. ("Central Parking") which is managing the Garage on the Debtor's behalf.

While the Garage Management Agreement was only recently entered into, Central Parking has presented income projections which show that the Debtor's projected income will now be approximately five times its previous income before the construction project was begun thereby stabilizing the Debtor's cash flow and projecting the profitability which the Debtor and its equity holders thought was possible when the Garage was first purchased.

The Debtor has filed a Plan which provides for a cramdown restructuring of the first mortgage held by 308 in the claimed amount of $2,234,553.74[1] as of January 24, 2013 (the "Petition Date") including pre-petition interest arrears together with legal fees and additional costs and charges.    308 has claimed that it is entitled to receive additional interest accruals on its mortgage during the period of the Chapter 11 case. To the extent that the Court agrees with 308's position, the additional interest shall be added to the principal balance of the mortgage and will be paid as described in this Disclosure Statement. The maturity date shall be extended to ten (10) years from entry of the Confirmation Order. The new mortgage total of $2,234,553.74 (or such amount as fixed by the Court) shall be paid in full, with post-confirmation interest to be readjusted under the analysis of cramdown interest posited by the Supreme Court in Till v. SCS Credit Corp., 541 U.S. 465, 124 S.Ct. 1951 (2004). This decision effectively permits a mortgage to be recast in bankruptcy to provide a reduced interest rate. The Debtor relies upon the

---

[1] The sum of $2,234,553.74 represents the amount claimed by 308. The Debtor contests certain charges in the claim and reserves the right under its Plan to object to the claim. The full amount of the claim is set forth in this Disclosure Statement for illustration purposes while the Debtor reserves its rights to object to the claim.

3

Till analysis to propose that 308's mortgage be paid interest after confirmation at the current Prime Rate of 3.25% plus a risk factor of 1.0% based upon a twenty-five year amortization schedule. The Debtor submits that this is an appropriate risk factor given the increase in the value of the Debtor's real property in the Chapter 11 case where the amount of the Debtor's allowed ancillary parking has doubled from ten to twenty vehicles and where the Debtor's income is projected to increase four fold.

Post-confirmation interest and amortization payments shall be made to 308 in equal installments of $12,105.43 with a balloon payment for the balance due at the end of the 120th month after the Effective Date of the Plan (the "Revised Maturity Date"). The Debtor projects that the unpaid Principal Balance of the mortgage will total $1,601,247.50 on the Revised Maturity Date. This analysis is for illustration purposes and is based upon the principal balance of the 308 mortgage being $2,234,553.74 on the Effective Date of the Plan. To the extent that the Allowed Amount of the 308 claim is fixed by the Court in an amount greater or less than $2,234,553.74, then the monthly installments through the Revised Maturity Date and the projected balance of the mortgage on the Revised Maturity Date shall be adjusted upward or downward as the case may be. In addition, the Debtor expects that 308 will contest the interest rate, and the Revised Maturity Date of the mortgage and if the Debtor and 308 do not reach a settlement, then the Court will fix the post-confirmation interest rate of the mortgage as well as the Revised Maturity Date of the 308 mortgage. 308 shall retain a first mortgage lien on the Garage until the restructured first mortgage is satisfied. In addition, 308 will retain all of

4

the collateral which was given to its predecessor in interest at the time the mortgage was given to the Debtor.

308 believes that the interest rate standard in Till is not the appropriate interest rate in this case. The Debtor contends that it relies upon Till's analysis for the proposition that Bankruptcy Court has the authority to restructure and recast 308 mortgage. The Debtor further contends that the interest rate and Revised Maturity Date of the 308 mortgage are consistent with the current market interest rate environment taking into account the location of the Debtor's real property, its income projections and the changes to the allowed use of the garage. The pre-petition real estate taxes owed to the City of New York will be paid over five years, with all statutory interest. Unpaid post-petition taxes owed to the City of New York will be paid on the Effective Date with all statutory interest.

Unsecured creditors will receive a fifty (50%) percent payment of their respective claims on the Effective Date of the Plan and an additional fifty (50%) percent dividend six months after the Effective Date.

The payments due under the Plan will be funded from the Debtor's on-going rental income. To the extent necessary to make up any shortfall in the Plan payments and to make the payments due on the Effective Date, the putative equity holders (John Danalis and John Lapsatis) of the Debtor may make additional prime interest subordinated loans to the Debtor as additional New Value Contributions, as partial consideration of the retention of their equity interests in the Reorganized Debtor.

5

The Debtor has met with representatives of the Condo Board to discuss and negotiate its claim treatment under the Plan. The Condo Board has approved the Plan's treatment of its claim. The Debtor has endeavored to have a meeting with 308 to discuss its claim, however, 308 has been unwilling to meet with the Debtor to discuss its claim unless that meeting take place under conditions prescribed by 308.

2.   **Voting Procedure.**   In accordance with section 1126(f) of the Bankruptcy Code, only classes of claims that are impaired under the Plan may vote to accept or reject the Plan. A class of claims is impaired if the Plan modifies, alters or changes the claimant's legal, equitable or contractual rights against the Debtor. In this case, classes 2 (308), 3 (Condo Board) and 4 (General Unsecured Creditors) are deemed impaired and are eligible to vote. The interests of Class 5 equity interest holders are unimpaired. Moreover, as insiders of the Debtor, the interest holders are not entitled to vote.

Ballots for acceptance or rejection of the Plan should be completed by all classes of creditors. After carefully considering this Disclosure Statement and the Plan, please indicate your vote on the enclosed ballot and return same before the voting deadline to Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway - 22nd Floor, New York, New York 10036 - Attn: Neal M. Rosenbloom, Esq.

In order to be counted, your ballot must be actually received by Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway - 22nd Floor, New York, New York 10036 Attn: Neal M. Rosenbloom, Esq., on or before _____, 2014  (the

6

"Voting Deadline"). All forms of personal delivery of ballots including overnight delivery service, courier service, and delivery by hand are acceptable. Facsimile and electronic transmissions are acceptable as well. There is no need to file your Ballot with the Clerk of the Bankruptcy Court. If your ballot is damaged or lost, or if you do not receive a ballot to which you are entitled, you may request in writing a replacement by contacting Goldberg Weprin Finkel Goldstein LLP, Attn: Neal M. Rosenbloom, Esq., at the stated address.

Only actual votes will be counted. A failure to return a ballot will not be counted either as a vote for or against the Plan. If no votes to accept or reject the Plan are received with respect to a particular class, the class will be deemed to have voted to accept the Plan. If a creditor casts more than one ballot voting the same Claim before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior ballots.

3.    **Financial Disclosure.**  Accompanying this Disclosure Statement is the projection of operating profit provided to the Debtor by Central Parking for the first year of its management contract with the Debtor. Also, the Debtor's putative stockholders, John Danalis and John Lapsatis shall provide the Court, *in camera*, with their personal financial information showing that they have the financial ability to lend the Debtor the funds needed on the Effective Date of the Plan and to provide the Debtor with any loans which it might require to meet short term cash shortfalls during the life of the Plan.

7

4.    **Confirmation.**   Your vote on the Plan is important.   In order for the Plan to be accepted on a consensual basis, each class must accept the Plan.   Acceptance is based upon affirmative votes from each class of creditors of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims of those who actually vote.

If certain classes vote against the Plan, the Bankruptcy Court may still confirm the Plan if (a) at least one class votes to accept the Plan, and (b) the Court finds that the Plan (i) does not unfairly discriminate against the impaired class or classes voting against the Plan, and (ii) accords fair and equitable treatment to those impaired classes. The Debtor reserves the right to request a "cramdown" confirmation if any other class of claims does not vote in favor of the Plan.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan for _____ at the United States Bankruptcy Court for the Sothern District of New York, One Bowling Greene, Courtroom 523, New York, New York 10004.   Any party in interest may object to confirmation of the Plan.   The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan, be served upon: counsel to the Debtor, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036 – Attn: Neal M. Rosenbloom, Esq. on or before ____ _____, in the manner described in the order scheduling hearing on confirmation accompanying the Disclosure Statement.   The Confirmation

8

Hearing may be adjourned from time to time without further notice other than by announcement in open court.

5. **Disclaimer.** The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of the Plan. No representations other than those explicitly set forth in this Disclosure Statement are authorized concerning the terms of the Plan or the Debtor's assets or the extent of the Debtor's liabilities.

This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the case and certain financial information. Although the Debtor believes that the Disclosure Statement is accurate, the terms of the Plan govern, and creditors are advised to review the Plan in its entirety.

## II.    EVENTS LEADING UP TO THE BANKRUPTCY FILING

As noted above, the Debtor's decision to seek Chapter 11 relief was necessitated by a foreclosure action commenced by 308's predecessor in interest, Country Bank.

## III.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY

Shortly after the Chapter 11 case was filed, the Debtor presented to the Court a proposed application seeking authorization to enter into a construction contract with TMI Contracting ("TMI") to reconstruct and reconfigure its access ramp to the Garage so as to enable it to double its accessory parking and allow it to then use the Garage for transient parking. The Order also sought authorization to allow the Debtor to

borrow up to $120,000.00 from John Danalis and John Lapsatis to finance the construction project.

Objections to the requested relief were filed by 308 and by the Condo Board. The Debtor attempted to amicably resolve the objections filed by the two key creditors and to anticipate additional potential objections by creditors relating to the inability of the Debtor to finance its Chapter 11 case while the construction project was taking place. The Debtor's putative stockholders expressed their willingness to lend the Debtor the funds needed to make all required payments while the construction project was unfolding thereby enabling the reorganization process to unfold in an efficient manner. The Condo Board's objections focused upon it being provided with the approvals from the municipal authorities having jurisdiction over the Debtor's proposed construction project. All of the documents showing the municipal approvals were provided to the Condo Board which also expressed a concern that the project could be abandoned midway, leaving the Condo at risk. The Condo also wanted financial assurances that the contract would be completed and that the work would be done consistent with the applicable rules and regulations of the Condo Board. The Debtor provided the Condo Board with the information that it requested. The Debtor also agreed to begin making regular common charge payments to the Condo Board effective as of February 1, 2013, the first full month after the filing of the Chapter 11 case. The Plan will also provide for certain mutual releases to be granted by and among the Debtor and the Condo Board, and their respective related parties, as set forth in detail in section 4.8 of the Plan.

10

The mortgagee's objections were of a different character.    First, the mortgagee sought to have the loans treated as capital contributions.  The mortgagee also objected to the Debtor's use of collateral.

The Court overruled both objections.    Ultimately, the Court entered two Orders.  The first Order authorized the Debtor to borrow money from its putative equity holders for the construction project and to finance the Debtor's obligations during the construction project.    The second Order authorized the Debtor to enter into the construction project with TMI.  After coordinating with the contractor to determine its availability to begin the construction project, notice was given to the Garage customers of the need to vacate the Garage so that the construction project could begin.  TMI then smoothly completed the construction project without complication and with minimum delay.

While these efforts were unfolding, the Debtor negotiated a Garage Management Agreement with Central Parking, one of the largest garage operators in the New York metropolitan area.    The Debtor requested the Court to approve the Management Agreement with Central Parking and, over the objection of 308, the Court approved the Management Agreement where, Central Parking has forecast annual net income to the Debtor exceeding $250,000.00 per annum based upon the increased accessory capability of the Garage and by having transient parking allowed at the Garage.

11

Completion of the construction project and entering into the Management

Agreement with Central Parking has paved the way for filing the Debtor's Plan of

Reorganization with the Court.

## IV.    THE PLAN

The Plan divides claims into five classes:

Class 1 - City of New York Real Estate Tax Liens
Class 2 - 308 Secured Mortgage Claim
Class 3 – Condo Board Secured Judgment Claim
Class 4 - General Unsecured Claims
Class 5 - Equity Interest Holders

Administration expense claims are not separately defined under the Plan

and shall be paid in full as allowed by the Bankruptcy Court.  Administrative Expense

Claims includes all unpaid operating costs since the Chapter 11 petition was filed,

including the costs of the bankruptcy case, unpaid taxes and outstanding trade debt.

The unpaid costs of the Chapter 11 case consists of professional fees and

expenses incurred by the Debtor's counsel projected to amount to approximately $65,000,

exclusive of a pre-petition retainer of $15,000.  Such fees and expenses remain subject to

Bankruptcy Court approval after application and additional notice to creditors.  The Plan

provides that payment of these fees and expenses will be made on the Effective Date or

under such terms as are reached between counsel and the Debtor after the fees are

formally awarded by the Court.

All post-petition debts and obligation debts incurred by the Debtor in the

ordinary course of business in maintaining and operating the Garage shall be paid in

12

accordance with their existing terms and conditions without formal treatment under the Plan.

The Debtor owes post-petition taxes and interest for the tax periods beginning July 1, 2013 ($31,532.88) and January 1, 2014 ($28,994.16) totaling $60,527.04 excluding interest. The outstanding amounts owed to the City of New York will be paid in full with statutory interest on the Effective Date.

### Class 1: Real Estate Taxes

**Classification** - Class 1 consists of the pre-petition Real Estate Tax Liens of the City of New York in the approximate amount of $70,277.75, plus interest prior to the filing date. The Debtor does not believe that it owes any money to any other taxing authority.

**Treatment** – The City of New York Class 1 Real Estate Tax Claim will be paid in twenty (20) quarterly installments of approximately $3,514.00 plus statutory interest commencing on the Effective Date of the Plan, until the taxes are paid in full with applicable statutory interest.

**Voting** –The Class 1 Real Estate Tax Claimant is not eligible to vote on the Plan.

### Class 2: 308 Mortgage Claim

**Classification** - Class 2 consists of the Mortgage held by 308 in the amount of $2,234,553.74 as set forth in the proof of claim filed with the Court.

13

**Treatment** – The Class 2 mortgage claim shall be restructured into a principal balance made up of the $2,234,553.74 owing to 308 (the "New Principal"). The maturity date shall be extended to ten (10) years from entry of the Confirmation Order.

The New Principal shall be paid over the reduced term of one hundred twenty (120) months as follows: interest at the revised "Till" rate of interest of 4.25% per annum, with amortization of New Principal based upon a twenty-five (25) year amortization schedule, in equal monthly installments of $12,105.43, with such payments starting on the Effective Date, and continuing for the next one hundred nineteen (119) months thereafter, with the then-outstanding New Principal balance ($1,601,247.50) to be paid as a balloon payment on the date which is one hundred twenty (120) months from the Effective Date (the "Revised Maturity Date").

The Debtor may prepay the 308 Mortgage in whole or in part without penalty.

When the 308 Mortgage is paid, 308 will, without cost or expense to the Debtor, give the Debtor's designee an assignment of mortgage or satisfaction of mortgage as requested by the Debtor.

John Danalis and John Lapsatis will continue to guarantee the 308 Mortgage.

Upon default, including the failure to pay upon final maturity, the interest rate shall increase by five (5%) percent.

14

**Voting** –The Class 2 claim of 308 is impaired and eligible to vote on the Plan.

## Class 3: Condo Board Judgment

**Classification** - Class 3 consists of the Secured Claim held by the Condo Board in the sum of $80,381.84 as of the Petition Date.

**Treatment** – The Condo Board will receive a cash distribution of $20,381.84 on the Effective Date of the Plan. The balance of the Condo Board claim totaling $60,000.00 will be paid with interest at the rate of four (4%) percent per annum measured from the Effective Date of the Plan in thirty (30) equal installments of principal and interest of $1,771.44 beginning one (1) month after the Effective Date.

The Debtor and the Condo Board shall enter into stipulations discontinuing with prejudice and without cost any and all actions where they are parties to litigations.

The Condo Board will retain its judgment lien until its claim has been fully paid under the Plan whereupon it will file a satisfaction of judgment.

**Voting** – Class 3 is impaired under the Plan and eligible to vote.

## Class 4: Unsecured Claims

**Classification** – Class 4 consists of Allowed Unsecured Claims.

**Treatment** – The Class 4 claims of non-insider unsecured creditors consist of three creditors owed an aggregate of approximately $27,000, who shall receive a dividend of 50% of their claims on the Effective Date of the Plan and another dividend of 50% of their claims six months after the Effective Date of the Plan. The payment made to

15

the holders of allowed Class 4 claims after the Effective Date will bear interest at the federal judgment rate on the Effective Date from the Effective Date to the Date of Payment.

>    **Voting** – Class 4 is impaired under the Plan and eligible to vote.

### Class 5: Equity Security Holders

>    **Classification** – Class 5 consists of the equity membership interests in the Debtor.

>    **Treatment** – Class 5 Equity Interest shall not be affected by the Plan and the pre-petition interest holder shall continue to retain its respective equity interests in the Reorganized Debtor following Confirmation of the Plan. The Debtor also believes that the continued retention of equity in the Reorganized Debtor is permissible by virtue of the fact that all creditors will be paid 100% of their allowed claims with interest and with the New Value Contributions which have been made and which will be needed to permit the Debtor to keep current in its obligations under the Plan. The Debtor believes that both factors support the continued retention of the equity under the Plan. All New Value Contributions will be in the form of loans, payable with interest fixed at the prime rate as of the Effective Date of the Plan, and subordinated to all taxes and liens. The Court has not determined whether any New Value Contributions satisfy the requirements of the Bankruptcy Code. The parties reserve their rights as to this issue.

>    **Voting** – Class 5 Equity holders are not eligible to vote because of their insider status.

16

## Other Significant Plan Provisions

**(A)** **Funding.** Funding for the Plan payments shall come from two sources. The payments due under the Plan will be funded from the Debtor's ongoing receipt of funds under the Central Parking Garage Management Agreement. The majority of the funds needed on the Effective Date of the Plan will be paid by new value contributions by Mr. Danalis and Mr. Lapsatis as may be necessary to meet obligations due on the Effective Date. Mr. Danalis and Mr. Lapsatis shall also backstop the Debtor's obligations over the life of the Plan to provide any additional funds which may be required to be paid from time to time.

**(B)** **Revesting of the Debtor's Property**. All property of the Debtor's estate shall revest in the Reorganized Debtor, subject to the restructured 308 mortgage, any statutory tax lien rights of the City of New York, and the judgment lien of the Condo Board all in accordance with the terms and conditions of the Plan.

**(C)** **Distributions.** All distributions shall be made by the Reorganized Debtor to holders of Allowed Claims. The Debtor shall file objections to any disputed claims no later than 60 days after Confirmation. No distribution shall be made with respect to a Disputed Claim unless and until the objection has been adjudicated, settled or withdrawn and become an Allowed Claim.

**(D)** **Executory Contracts and Unexpired Leases Deemed Assumed.** All executory contracts and tenant leases shall be deemed assumed on the Effective Date of the Plan under 11 U.S.C. §365(a) without the necessity of filing a formal notice of motion.

17

**(E)**   **Retention of Bankruptcy Court Jurisdiction.**   The   Plan   provides   that   the

Bankruptcy Court shall retain jurisdiction following confirmation of the Plan: (i) to

enforce, implement, interpret or modify the Plan under applicable provisions of the

Bankruptcy Code; (ii) to hear and determine all controversies, causes of action, and

motions, including to enforce any alleged defaults under the Plan, as well as any

objections to claims that may be pending at the time of Confirmation or filed within 60

days thereafter; (iii) to hear and determine applications for final compensation and/or

reimbursement of expenses; and (iv) to enter a final decree upon substantial

consummation of the Plan.

## VI.   BASIC REQUIREMENTS FOR CONFIRMATION OF THE PLAN

While § 1129(a) of the Bankruptcy Code lists a number of findings that

need to be made prior to Confirmation, two of the requirements are worth highlighting for

purposes of the Disclosure Statement:

### (A)   FEASIBILITY OF THE PLAN

As a prerequisite to confirmation, Bankruptcy Code § 1129(a)(11) requires

that the Debtor, as proponent of the Plan, demonstrate its ability to fund the Plan and

establish that confirmation is not likely to be followed by the need for further financial

reorganization or restructuring.   The Debtor believes that it has established its ability to

fund the Plan by virtue of its Central Parking Garage Management Agreement and the

projections therewith.   Annexed hereto as **EXHIBIT "A"** is a projection for one year

profits under the Management Agreement.   In addition, Mr. Danalis and Mr. Lapsatis

18

have provided the Court with evidence of their ability to make the payments due on the Effective Date of the Plan and to otherwise backstop receipt of payments by creditors in the event of cash flow issues during the life of the Plan. The balloon payment to 308 on the Revised Maturity Date will come either from the property being refinanced or by the mortgage being satisfied by the Debtor's equity holder on the Revised Maturity Date. As the Revised Maturity Date will be years in the future, there can be no assurance that a source to fund payment of the mortgage can be located, however, the Debtor believes that it will be able locate a source to either refinance or otherwise satisfy the mortgage.

### (B)    BEST INTERESTS OF CREDITORS TEST

In the event of lack of unanimous consent, the Plan must also be in the "best interests of creditors". This is a legal term of art which requires that the Plan provides a dividend to the class of creditors that vote against the Plan, which is equal to or greater than the distribution those creditors would realistically receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Significantly, the best interest of creditors test only comes into play in the event that the Plan is not unanimously accepted by all impaired classes of creditors.

The Debtor holds the opinion that by unsecured creditors being paid 100% plus interest, they would receive more than they would receive in a liquidation proceeding and they will get paid more quickly than in a liquidation proceeding as the Plan contemplates that unsecured creditors will be paid with interest within six months after the Effective Date of the Plan.

19

## CRAM DOWN

Confirmation of the Plan is important because it will permit the restructuring of the 308 mortgage in such a way as to free up cash flow so as to permit the Debtor to pay that mortgage as well as tax obligations, the Condo Board secured claim, and make a distribution to general creditors.

Therefore, the Debtor is committed to obtaining approval of the Plan even over the objections of 308, should it come to that. The Debtor's Plan can still be confirmed even if, as expected, 308 does not vote favorably on the Plan, through the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code, which permits confirmation if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests. The Debtor believes that the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

20

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule." Subject to certain exceptions, this rule, codified in Section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims or Interests that has not accepted the Plan must be paid in full if a more junior class receives any distribution under the Plan. Since the Plan proposed to have the Court fix the proper amount of interest due to 308, and then pay the mortgage and note of 308 in full, the Plan complies with the absolute priority rule by paying 308 all that it is entitled to by law. In that regard, the Debtor intends to rely upon Till for the proposition that the Court has the authority to restructure and recast the 308 mortgage. The Debtor further believes that its treatment of the 308 claim in the Plan is consistent with the market rate treatment given to first mortgages on real property like the property owned by the Debtor. Nonetheless, if the Debtor and 308 are unable to resolve their issues on this point, the Debtor intends to pay 308 whatever interest rate is fixed by the Court.

Moreover, one of the exceptions to the absolute priority rule is that equity holders have contributed new value and do not retain property on account of their prior equity holdings. Here, the absolute priority rule would not be violated because of the new value contributions that have been made by the Debtor's putative equity holders during the Chapter 11 case, on the Effective Date and to cover any Plan shortfalls over the life of the Plan. Specifically, the Debtor's putative equity holders have contributed $72,000 for construction costs paid to TMI, $108,980.17 to pay for other expenses in the Chapter 11 case as of December 9, 2013 without interest. The putative equity holders shall lend the

21

Debtor any additional funds which will be required through the Effective Date. In addition, the putative equity holders will lend the Debtor more than $150,000.00 on the Effective Date of the Plan to pay amounts needed for attorneys' fees, real estate taxes and amounts owed the Class 3 and Class 4 creditors.

## CONCLUSION

The Debtor believes the Plan is in the best interests of all creditors and strongly encourages all holders of claims against the Debtor to vote to accept the Plan.

Dated:  New York, New York
February _14_, 2014

GPS GLOBAL PARKING SOLUTIONS LLC

By: _____
John Lapsatis
Member of GPS Parking LLC

Dated:  New York, New York
February _14_, 2014

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Attorneys for the Debtor
1501 Broadway - 22nd Floor
New York, New York 10036
(212) 221-5700

By: _____
Neal M. Rosenbloom
A Member of the Firm

x:\gwfg\new data\dominique\word\clients\gps global parking solutions llc (#danal.31761)\amended disclosure statement (final - 2-12-14).doc

# EXHIBIT "A"

151 West 17th Street Estimated Operating Budget

| Net Revenue: | Year 1 |
|---|---|
| Transient | 377,500.00 |
| Monthly | 156,000.00 |
| Gross Revenues | 533,500.00 |
| Sales Tax | (82,815.21) |
| Total Net Revenue | 450,684.80 |
| | |
| Facility Operating Expenses: | |
| Payroll | 94,786.00 |
| Payroll Taxes | 8,682.00 |
| Workers Comp | 11,213.00 |
| Retirement | 1,422.00 |
| Union Health and Welfare | 21,360.00 |
| Supervisory Expense | 5,000.00 |
| Telephone | 2,100.00 |
| Equipment Expense | 2,200.00 |
| Repairs and Maintenance | 1,500.00 |
| Uniforms | 1,500.00 |
| Liability Insurance | 7,245.00 |
| Auto Damage | 5,000.00 |
| Licenses | 600 |
| Supplies and Postage | 2,000.00 |
| Professional Services | 3,880.00 |
| Credit Card Fees and Service Charges | 7,519.00 |
| Total Facility Operating Exp. | 176,007.00 |
| | |
| Subtotal Net Operating Income | 274,677.80 |
| Less Management Fees | 12,000.00 |
| Less Incentive Fees | 7,880.33 |
| | |
| Net Available to Owner | 254,797.46 |